UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLAYTON CIPOLLETTI,

Plaintiff,

v.

WAYNE COUNTY AIRPORT AUTHORITY,

Defendant.
______________________________________/

Case No. 19-13120

Stephanie Dawkins Davis
United States District Judge

**OPINION AND ORDER GRANTING**
**MOTION FOR SUMMARY JUDGMENT (ECF No. 22)**

## I. PROCEDURAL HISTORY

Plaintiff, Clayton Cipolletti, filed a complaint against his former employer, Wayne County Airport Authority (WCAA), for alleged violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. (FMLA). (ECF No. 1). WCAA filed a motion for summary judgment on February 15, 2021. (ECF No. 22). The court held a hearing, via video, on April 14, 2021. (ECF No. 24). For the reasons set forth below, the court **GRANTS** defendant's motion for summary judgment.

## II. FACTUAL BACKGROUND

WCAA is a government entity that operates the Detroit Metropolitan and Willow Run Airports. Cipolletti began working for WCAA in its Airport Response Center (ARC) in November 2015 as a dispatcher for police, fire and rescue. He was promoted to supervisor after about a year. (ECF No. 22-2, Ex. A,

14:17-24, 17:9-14).  Cipolletti's supervisor was Corey Noble, the ARC Manager.
(ECF No. 22-2, Ex. A 19:11-12, ECF No. 22-3, Ex. B 6:17-18).  Cipolletti had a
great working relationship with his co-workers and supervisors when he first
started at WCAA and throughout most of his time working at WCAA.  (ECF No.
22-4, Ex. C 5:5-10, 7:23-25, 8:1-5, ECF No. 22-3, Ex. B 13:25, 14:1-17).

According to WCAA, things changed when Cipolletti began experiencing
personal issues which led to his use of FMLA leave time to address mental health
concerns.  (ECF No. 22-2, Ex. A 31:9-12).  He received approval for all of the
FMLA leaves he sought.  (ECF No. 22-2, Ex. A 42:19-24).  And, he was never
denied FMLA use, sick time or permission to call off sick or take vacations.  (ECF
No. 22-2, Ex. A 102:17-22).  Cipolletti maintains, however, that he was
discouraged from seeking FMLA leave and was forced instead to use other forms
of leave (sick days, vacation time), and suffered consequences, including adverse
employment actions in retaliation for using FMLA leave.  (ECF No. 22-2, pp. 8-9).

The Union Collective Bargaining Agreement (CBA) governs an employee's
use of sick time.  Under the CBA, employees get 12 days of sick time to use per
year.  The CBA also differentiates between sick time and FMLA leave.  (ECF No.
22-3, Ex. B 31:24-25, 32:1-9).  Cipolletti was aware of WCAA's sick leave
policies and acknowledges that he received a copy of the Employee Handbook.
(ECF No. 22-2, Ex. A 16:13-19, 17:5-8).  WCAA's policy regarding excessive use

of sick time states that when an employee has more than five instances of unexcused sick time usage, the sixth time will trigger the discipline process. (ECF No. 22-3, Ex. B 32:10-17). FMLA usage requires WCAA employees to apply through a third-party company (Careworks), then that information is routed to Human Resources for approval. (ECF No. 22-3, Ex. B 31:24-25, 32:1-9). Between January 16, 2018 and September 19, 2018, Cipolletti called off of work sick on nine occasions. (ECF No. 22-9, Ex. H). On August 6, 2018, Noble warned Cipolletti that he needed to be careful with his use of sick time, stating:

> You need to be careful with your sick time use. Excessive use of paid sick time is defined as more than five instances in a year. At this point, you could have been written up twice. You may need to look into FMLA if you're going to call off once a month.

(ECF No. 22-9, Ex. H). Cipolletti maintains that he used about one sick day per month over a nine-month period in an effort to assuage his legitimate medical need for FMLA time, because his supervisors told him that using FMLA time and seeking attendant medical care would negatively impact his career. (ECF No. 23-2, pp. 45, 60). Cipolletti says he missed work due to diagnosed mental health issues such as clinical anxiety and depression, for which his psychiatrist and psychologist had both directed he take leave. (ECF No. 22-2, pp. 36, 39-40).

In September 2018, Cipolletti left his home and moved in with Melissa Green, WCAA's Assistant Deputy Director of Special Services and her partner,

WCAA Police Chief Marty Kolakowski, for a couple of weeks. (ECF No. 22-2, Ex. A 7:13-17, 61:21-23, ECF No. 22-5, Ex. D 7:18-21, 11:12-25, 12:1-5). The first few days he lived with Green and Kolakowski, Green says Cipolletti did not go to work at all. (ECF No. 22-4, Ex. C 15:24-25, 16:1-7). Around this time, Noble issued the first of two formal reprimands to Cipolletti. Both reprimands concerned attendance issues. (ECF No. 22-3, Ex. B 20:14-18). The first discipline incident involved his sick time usage. Cipolletti had multiple occurrences of unexcused sick time. (ECF No. 22-3, Ex. B 20:19-25, 21:1-5). Cipolletti received an oral reprimand on September 20, 2018 for attendance issues. The September 20, 2018 reprimand states that he called in sick from work without any sick time left in his bank and warned that another instance of excessive sick time usage would subject Cipolletti to further discipline. (ECF No. 22-10, Ex. I). The oral reprimand was further supported by a written agreement signed by Cipolletti, Noble, and Michael Smouthers, Vice President of Public Safety and dated September 21, 2018, which confirmed that the oral reprimand would be held in abeyance unless he had another unexcused sick time usage. It also stated that if another attendance issue occurred, he would be subject to progressive discipline. (ECF No. 22-11, Ex J). The agreement was created because Smouthers was trying to help Cipolletti and make sure he was able to go to the police academy. (ECF No. 22-2, Ex. A 71:9-17).

On December 20, 2018, Cipolletti was first approved for continuous FMLA leave between December 10, 2018 and December 22, 2018.  (ECF No. 22-12, Ex. K).  Cipolletti's second attendance incident resulted in a written discipline on January 8, 2019.  (ECF No. 22-13, Ex. L).  Between January 1, 2019 and January 7, 2019, Cipolletti called off work twice, used a vacation day when he did not have time in his bank and called off on a day for which he had already been denied the use of a swing day.  (ECF No. 22-3, Ex. L).  On January 8, 2019, Noble revoked the oral reprimand and issued a written discipline to Cipolletti for his attendance issues because, per the agreement, the initial oral reprimand was held in abeyance conditioned on him having no other issues and he had failed to meet the requirements of the deal.  (ECF No. 22-14, Ex. M).

In February of 2019, Cipolletti applied and interviewed for the Training Coordinator position.  (ECF No. 22-15, Ex. N; ECF No. 22-2, Ex. A 20:13-15, 23:2-8).  The CBA between WCAA and the union governs the promotion process and opportunities available to its members.  The CBA also provides a process for an unsuccessful promotion candidate to appeal the denial of a promotion to an Appeals Board.  (ECF No. 22-16, Ex. O ¶ 17.09).  The candidates had to apply for the position and then they interviewed with prearranged questions.  (ECF No. 22-3, Ex. B 30:10-23).  The interview consisted of scoring the candidates' responses to the series of predetermined interview questions.  (ECF No. 22-3, Ex. B 30:10-23).

The answers were scored individually and had multiple possible points that the interviewers were expecting the candidate to mention. The number of points mentioned by a candidate would affect the score. The questions included suggested answers. (ECF No. 22-3, Ex. B 30:10-23; ECF No. 22-17, Ex. P). Each question was separately scored, and Human Resources was responsible for adding up the scores. (ECF No. 22-3, Ex. B 19:6-9). Noble, Barclay Stewart, Deputy Director of Special Services, and Thomas Zahina, Deputy Police Chief, were on the interview panel for the Training Coordinator position. (ECF No. 22-2, Ex. A 26:5-10; ECF No. 22-3, Ex. B 31: 4-19). Pursuant to the CBA, WCAA had the choice to pick any candidate ranked between one and five. (ECF No. 22-3, Ex. B 19:10-11, 14-16). Cipolletti received a score of 83, while another candidate, John Barile, received a 94. As a result, Barile was ranked first place and Cipolletti was ranked second on the list of candidates. (ECF No. 22-18, Ex. Q; ECF No. 22-19, Ex. R). Noble, Stewart, and Smouthers agreed that the first-place candidate, John Barile, should be promoted to the Training Coordinator position. (ECF No. 22-19, Ex. R).

Cipolletti maintains, however, that the selection process was not so neatly tied up by scores alone. He contends that Noble made it clear that the use of FMLA leave would jeopardize his chances of promotion and he likewise told another candidate the same thing. (ECF No. 23-8, Ex. G, Affidavit of Heather

Rossi; ECF No. 23-2, Ex. A, pp. 90-91).  Cipolletti also points to an email from

Noble stating that he believes Cipolletti is a significant liability, referencing his use

of FMLA.  (ECF No. 23-9, Ex. H, April 8, 2019 Email).  Cipolletti says he

informed Melissa Greene and Zainab Beydoun, who had supervisory authority,

about Noble's threats of negative career consequences if he used FMLA, but no

one provided guidance or addressed his concerns.  (ECF No. 23-2, p. 95).

As Cipolletti continued to call off of work and use up his sick time, on April

1, 2019, Noble emailed Cipolletti and advised that he had again reached five

instances of sick leave violations in the year and warned him that on the sixth sick

leave violation, he would be subject to progressive discipline.  Due to his history

with sick leave issues, Noble also told him that he may be risking suspension.

(ECF No. 22-20, Ex. S).

On April 6, 2019, Cipolletti called WCAA and stated that he was going on

FMLA leave starting the day before and would also be using FMLA leave on April

9, 2019.  (ECF No. 22-22, Ex. U).  On Tuesday, April 9, 2019, WCAA received a

call from a nurse at Beaumont Wayne Hospital's Emergency Department

informing them that Cipolletti had been unable to come to work on the previous

Friday, April 5, 2019.  (ECF No. 22-23, Ex. V).  On April 10, 2019, Cipolletti sent

a text message to Noble telling him that he could not return to work that weekend.

Noble then told Cipolletti that he would indicate in the computer system that he

was on FMLA leave until the following Tuesday and told Cipolletti to update him on his return date. (ECF No. 22-24, Ex. W). A week later, on April 17, 2019, Noble asked Cipolletti if he was returning to work that day. Cipolletti responded that he would return on April 22, 2019. (ECF No. 22-24, Ex. W). On April 22, 2019, Cipolletti sent Noble a text message saying that he was waiting on FMLA paperwork and would return to work on April 24, 2019. (ECF No. 22-24, Ex. W). Pursuant to the FMLA paperwork, Cipolletti was cleared to return to work on April 22, 2019. (ECF No. 22-25, Ex. X). The next day, Cipolletti confirmed that he would return to work on April 24, 2019. (ECF No. 22-24, Ex. W). On April 26, 2019, Cipolletti was retroactively approved for continuous FMLA leave from April 10, 2019 to April 23, 2019 and intermittent FMLA leave from April 24, 2019 until October 24, 2019. (ECF No. 22-26, Ex. Y; ECF No. 22-27, Ex. Z).

That same day, Cipolletti received a paycheck in an amount that was less than he was entitled. (ECF No. 22-2, Ex. A 43:12-17). On April 26, 2019, he emailed Human Resources (HR) and Payroll regarding the discrepancy. (ECF No. 22-28, Ex. AA; ECF No. 22-3, Ex. B 25:11-14). Within two hours, HR informed Cipolletti that a corrected paycheck would be cut. He was also told that he should apply for long term disability if he was going to be off for a while. (ECF No. 22-28, Ex. AA). The issue was resolved after he spoke to HR. (ECF No. 22-2, Ex. A 48:13-17). According to WCAA, Cipolletti's FMLA paperwork was not timely

finalized, so his timesheet did not reflect his excused absence.  Thus, his paycheck was initially less than it should have been.  (ECF No. 22-29, Ex. BB).  The next day, on April 27, 2019, Cipolletti resigned from his position with WCAA while he was on FMLA leave.  (ECF No. 22-30, Ex. CC; ECF No. 22-2, Ex. A 43:12-14, 85:16-25, 87:2-6).

## III.   ANALYSIS AND CONCLUSIONS

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be

construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Hence, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, then on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B. FMLA Legal Framework

"The FMLA makes it unlawful for any employer 'to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act],' 29 U.S.C. § 2615(a)(1), or to 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act].' *Id*. at § 2615(a)(2)." *Seeger v. Cincinnati Bell Tel. Co.*, *LLC*, 681 F.3d 274, 281 (6th Cir. 2012). "Consistent with these proscriptions, '[e]mployers may not

discriminate against employees on FMLA leave in the administration of their paid leave policies.'" *Id*. (quoting 29 C.F.R. § 825.207(a)).

The Sixth Circuit recognizes "two discrete theories of recovery under the FMLA: (1) the so-called 'interference' or 'entitlement' theory arising from § 2615(a)(1), and (2) the 'retaliation' or 'discrimination' theory arising from § 2615(a)(2)." *Id*. "[T]he requisite proofs differ" for interference and retaliation claims. *Id*. The primary distinction is that employer intent is not considered in an interference claim. "The interference theory has its roots in the FMLA's creation of substantive rights, and '[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred,' regardless of the intent of the employer." *Id*. (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)). The opposite is true of FMLA retaliation claims. "The central issue raised by the retaliation theory, on the other hand, is 'whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.'" *Id*. (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). "In contrast to the interference theory, '[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights.'" *Id.* (quoting *Edgar*, 443 F.3d at 508).

1. FMLA Interference Claim

FMLA interference claims arise under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." To establish a prima facie case of interference, the plaintiff must prove that: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave the employer notice of his intention to take leave; and (5) the defendant denied [or interfered with] the employee FMLA benefits to which he was entitled. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (citing *Edgar*, 443 F.3d at 507). However, the FMLA is not a strict-liability statute; "employees seeking relief [based on FMLA interference] must ... establish that the employer's violation caused them harm." *Id*. at 508 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)); *see also Hollins v. Ohio Bell Tel. Co.*, 496 F. Supp.2d 864, 871 (S.D. Ohio 2007) (stating that, even where an employer interferes with the exercise of FMLA rights, FMLA "provides no relief unless the employee has been prejudiced by the violation"). Furthermore, interference is not actionable if "the employer ha[d] a legitimate reason unrelated to the [employee's] exercise of FMLA rights for engaging in the challenged conduct," *id*., such that the challenged

conduct "would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban*, 345 F.3d at 401.

As explained in *Revennaugh v. United States Postal Serv*., there has been some debate about whether the *McDonnell Douglas* burden shifting framework applies to FMLA interference claims. 2019 WL 4674250, at *13-14 (S.D. Ohio Sept. 25, 2019) (citing *Donald v. Sybra, Inc*., 667 F.3d 757, 762 (6th Cir. 2012)) (noting the confusion over whether *McDonnell Douglas* applies to interference claims). In *Donald*, the Sixth Circuit noted that it has "effectively adopted the *McDonnell Douglas* tripartite test without saying as much." *Id*. *Revennaugh* points out that *Donald* relied on *Grace v. USCAR*, in which the Sixth Circuit "stated that, in an FMLA interference claim, an employer may prove it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee." *Donald*, 667 F.3d at 762 (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)). The employee can then "seek to rebut [the proffered reason] by a preponderance of the evidence ... 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Grace*, 521 F.3d at 670 (quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003)).

The Sixth Circuit in *Grace* concluded that this burden-shifting applied despite the fact that "[a]n employer's intent is not directly relevant to the

[interference] inquiry," because there is no FMLA interference "'if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct.'" *Id*. (citing *Grace*, 521 F.3d at 670, quoting *Edgar v. JAC Prods*., 443 F.3d 501, 508 (6th Cir. 2006)). A later, unpublished decision suggested that the *McDonnell Douglas* framework may only apply if an employer in fact "offer[s] a 'legitimate reason unrelated to the exercise of FMLA rights.'" *Id*. (citing *Jaszczyszyn v. Advantage Health Physician Network*, 504 Fed. Appx. 440, 448 (6th Cir. 2012) (quoting *Donald*, 667 F.3d at 762)). Within this burden-shifting framework, "[t]he ultimate burden of persuasion remains at all times with the plaintiff." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Additionally, the standard for determining what constitutes an adverse employment action is higher for interference claims than the standard for adverse employment actions in the retaliation context. *Revennaugh*, at *16 (citing *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 632 (6th Cir. 2018) (addressing an interference by retaliation claim and noting that plaintiff is still required to establish that the employer took adverse employment action against her and that "*Wysong* did not create a category of "retaliation-lite" claims"). Because of the higher standard for finding that an adverse employment action occurred in the interference context, actions that are materially adverse in the retaliation context

may not necessarily be considered so for an interference claim. *Id.* (citing *Spellman v. Ohio Dep't of Transportation*, 244 F. Supp. 3d 686, 703 (S.D. Ohio 2017) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007)).

WCAA maintains that Cipolletti cannot establish the fifth element of the FMLA interference claim. In support, WCAA provides evidence showing that Cipolletti was never denied any requested FMLA leave. Cipolletti was approved for FMLA leave three times during his employment with WCAA. (ECF Nos. 22-12, 22-26, 22-27). Cipolletti admitted that he used FMLA leave. (ECF No. 22-2, 42:19-24). He also admitted that he was never denied FMLA use, sick time, or the right to call off sick or take vacations. (ECF No. 22-2, 102:17-22). Accordingly, WCAA argues that Cipolletti's interference claim fails on the fifth element of the prima facie case.

Cipolletti argues that there is a material dispute of fact as to the fifth element based on *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 446-447 (6th Cir. 2007), which held that retaliatory discharge for taking FMLA leave is a cognizable theory under § 2615(a)(1). *Wysong* held that for an interference claim, if an employer takes employment action based in whole or in part on the fact that an employee used FMLA leave, the employer has denied the employee a benefit to which he is entitled. It is on this basis that plaintiff asserts his interference claim – that

WCAA's failure to promote him and his constructive discharge were based on his

use of FMLA time and thus, support the fifth element of the interference claim.  At

the hearing, Cipolletti also offered another theory to support his interference claim.

He explained that Noble "discouraged" him from taking FMLA leave by indicating

that it could affect his chances for promotion.  And he points to a statement from

Kolakowski saying he should not use FMLA for his mental illness because it

would hurt his chances of becoming a police officer.  Based on these statements,

Cipolletti says he took sick leave instead and that he would have taken FMLA

leave much earlier than he did, were he not discouraged from doing so.

Accordingly, Cipolletti appears to be asserting three theories to support his

argument that there is question of fact on the fifth element of his interference

claim: (1) failure to promote as an adverse employment action; (2) constructive

discharge; and (3) the "discouragement" theory.  The court will address each

theory in turn.

a.    Failure to promote

In *Rossi v. WCAA*, 2021 WL 1026909, *4, n.2 (E.D. Mich. Mar. 17, 2021), a

similar FMLA case filed by Cipolletti's former co-worker, the court concluded

that, contrary to Cipolletti's argument here, *Wysong* does not support the theory

that failure to promote is an "FMLA benefit" for purposes of an interference claim.

Rather, the court concluded that the interference theory relates only to "substantive

entitlements specified by the FMLA" such as leave time and reinstatement, not promotion. *Id*. *Rossi's* conclusion is grounded in binding precedent from the Sixth Circuit. In *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012), the plaintiff took qualified FMLA leave at intermittent periods due to pain in his leg and back, and was restored to his prior position upon returning to work. *Seeger*, 681 F.3d at 277-279. However, after his return, the plaintiff was suspended and eventually terminated for "over-reporting" his symptoms in order to gain the benefits of a separate paid leave policy without having to perform the work required to normally be eligible for that policy. *Id*. at 279-280. The *Seeger* plaintiff raised both interference and retaliation claims under the FMLA. *Id*. at 282. The Court of Appeals explained that, while retaliatory actions may give rise to claims under the interference theory, there had been no interference with the plaintiff's <u>substantive FMLA rights</u> given that his requests for FMLA leave were approved, he had received all the FMLA leave to which he was entitled, and he was reinstated to the position he held prior to his FMLA leave. *Id*. at 283.

Similarly, the court in *Campbell v. Costco Wholesale Corp*., 2013 WL 5164635, at *4 (M.D. Tenn. Sept. 12, 2013) relied on *Seeger* to conclude that the defendant's failure to promote the plaintiff was not interference because she was approved for FMLA leave and was reinstated to her position on her return from leave. Likewise here, Cipolletti was approved for FMLA on December 20, 2018

for the period of December 10, 2018 through December 22, 2018. (ECF No. 22-12, Ex. K). He was approved for additional FMLA leave in April 2019 and was approved for intermittent FMLA leave through October 2019. (ECF Nos. 22-22, 22-24, 22-25, 22-26, 22-27, Exs. U, W, X, Y, Z). There appears to be no dispute that Cipolletti returned to the same position after using his FMLA leave and that he was never denied any requested FMLA leave. Accordingly, just as in *Seeger* and *Campbell*, Cipolletti has not demonstrated how the failure to promote interfered with his substantive rights under the FMLA. As such, Cipolletti's failure to promote theory does not support an interference claim.

b. Constructive discharge

In his brief, Cipolletti argues that he was constructively discharged "after it became clear that Defendant would continue to threaten his career and take adverse employment actions if he used FMLA time." (ECF No. 23, PageID.526, citing ECF No. 23-2, p. 98). In this vein, Cipolletti also cites Noble's April 8, 2019 email in which he wrote "Clayton called off FMLA on Saturday for Friday 6th and Monday 8th. I believe Clayton is a significant liability. I worried [sic] Clayton could be involved in an event that could bring a bad name to WCAA and Public Safety Division." (ECF No. 23-9). Cipolletti also points out that in his email inquiring about being shorted pay, he stated that Noble was targeting him based on

his use of FMLA, and no one at WCAA addressed this issue. (ECF No. 23, PageID.532; ECF 22-28, Email dated 4/26/19).

As explained in *Russell v. CSK Auto Corp.*, 739 Fed. Appx. 785, 794-95 (6th Cir. 2018): "To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (internal quotation marks and alterations omitted) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id*. (quoting *Moore*, 171 F.3d at 1080). To determine whether the first prong of a constructive discharge claim has been met, the court considers a number of factors.

> Whether a reasonable person would have fe[lt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001) (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Cipolletti provides little analysis of his claim of constructive discharge. He refers to comments made by Noble about FMLA use affecting his chances for promotion, Noble's April 8, 2019 email, along with being shorted pay (which was corrected within hours) and WCAA's failure to follow up on his April 26, 2019 report of Noble's comments, but he does not analyze any of the elements in *Russell* or factors set forth in *Logan*. It is not sufficient for him to just say he was constructively discharged without providing both facts and analysis to satisfy the fifth element of an interference claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (quoting *Citizens Awareness Network*, *Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995) (citation omitted)); *see also Emerson v. Novartis Pharm. Corp.*, 446 Fed. Appx. 733, 736 (6th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("'Judges are not like pigs, hunting for truffles' that might be buried in the record.").

Noble's comments are insufficient to support a claim of constructive discharge, in any event. *Groening v. Glen Lake Community Schools*, 884 F.3d 626 (6th Cir. 2018) is instructive in this regard. In *Groening*, the plaintiff described the following events as "intolerable" working conditions, leading to her constructive discharge:

> She says the board subjected her to months of hostility because it believed her leave was holding up the school district's business. One board member told Groening that she was concerned about how much time the district spent working around Groening's schedule. The board president indicated to a colleague that he planned to hold Groening accountable for taking leave in her next performance evaluation. And eventually, fed up with Groening and looking for a reason to get rid of her, the board spearheaded an audit that was designed to find evidence of wrongdoing. The board members then continued to complain that Groening was not doing her job and was "wasting [their] time." R. 64-15, Pg. ID 720. As such, Groening says, she had no choice but to resign.

Noting the high bar in proving constructive discharge, the Court of Appeals concluded that the plaintiff's allegations that she was subjected to months of hostility about her schedule and leave fell short of showing constructive discharge, particularly where the plaintiff was unaware of the some of the comments about which she now complained. *Id*. at 630.[1] The court also pointed out that an

---

[1] While this portion of the court's analysis pertained to the plaintiff's constructive discharge theory of FMLA retaliation, the court later explained that these same facts were

employer's criticism of an employee does not amount to constructive discharge, especially when the employer's criticism is limited to a few isolated incidents. *Id*. Similarly, Cipolletti is only able to point to a few conversations where he was discouraged from taking leave, which is insufficient to support a claim of constructive discharge. (ECF No. 23-2, p. 45). The court finds that Noble's comments are insufficient to meet the high burden required for showing constructive discharge. Significantly, Cipolletti does not offer any evidence that he was aware of the April 8, 2019 email before he submitted his resignation to WCAA. He was not copied on the email and nothing in the record indicates that he was privy to this email before parting ways with WCAA. Thus, he has not provided a basis upon which one might reasonably conclude that the email contributed to Cipolletti's perception of any hostile work environment that could form the basis of his constructive discharge claim. Next, the shorting of Cipolletti's pay caused by a delay in the processing of his FMLA approval was corrected within hours. Cipolletti does not offer any evidence to refute WCAA's version of events regarding this incident. Thus, this incident does not support a claim of constructive discharge. Finally, Cipolletti's claim that WCAA did not respond to his complaint about Noble's comments as set forth in his April 26, 2019

---

insufficient to support a constructive discharge theory for the plaintiff's interference claim. *Id*. at 632.

email is not particularly suggestive of the type of hostile work environment necessary to support a constructive discharge claim, given that WCAA hardly had an opportunity to respond to the allegation because Cipolletti resigned the very next day. (ECF No. 22-28, Ex. AA; ECF No. 22-3, Ex. B 25:11-14; ECF No. 22-30, Ex. CC; ECF No. 22-2, Ex. A 43:12-14, 85:16-25, 87:2-6). Even viewing the evidence in the light most favorable to Cipoletti, the court finds that he has not come forward with evidence showing the existence of a material question of fact on his constructive discharge claim.

c. Discouragement

As explained above, Cipolletti offered another theory to support his interference claim not fully explored in his brief. He claimed that Noble "discouraged" him from taking FMLA leave by indicating that it could affect his chances for promotion. He also points to Kolakowski's statement that he should not use FMLA for his mental illness because it would hurt his chances of becoming a police officer. Based on these statements, Cipolletti says he took sick leave instead of FMLA and that he would have taken FMLA leave much earlier than he did, were he not discouraged from doing so. Given that Cipolletti's argument is supported by his deposition testimony, the court will address this theory, despite Cipolletti having failed to fully brief the issue with supporting case law.

Cipolletti's discouragement theory finds support in the FMLA and its accompanying regulations. "[I]nterfering with the exercise of an employee's rights under the FMLA includes discouraging an employee from using FMLA leave." *Arban v. West Pub. Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (internal quotations omitted) (quoting 29 C.F.R. § 825.220(b)). "Courts require a plaintiff pursuing a discouragement theory to offer evidence she tried to assert her FMLA rights and was discouraged, unless the employer's actions would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise her FMLA rights." *Vess v. Scott Med. Corp.*, 2013 WL 1100068, *2 (N.D. Ohio 2013). That an employer's conduct might "chill" use of FMLA leave is not enough unless plaintiff "offer[s] evidence that it, in fact, caused her or any other employee to refrain from requesting or using FMLA leave." *Bonfiglio v. Toledo Hospital*, 2018 WL 5761220, *12 (N.D. Ohio Nov. 1, 2018) (quoiting *Santoli v. Vill. of Walton Hills*, No. 2015 WL 1011384, *5 (N.D. Ohio 2015)).

Even if Noble's comments are sufficient to show interference by discouragement, Cipolletti has not even attempted to show that he was damaged by this violation. As explained in *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 455 (6th Cir. 2005), employers who violate § 2615 are "liable to any eligible employee affected" for damages and "for such equitable relief as may be appropriate." *Id*. (quoting 29 U.S.C. § 2617(a)(1)). In *Cavin v. Honda of America*

*Manufacturing*, *Inc*., 346 F.3d 713, 726 (6th Cir. 2003) (superseded on other grounds by 29 C.F.R. § 825.302(d)), the court found that "[e]ven when an employee proves that his employer violated [section] 2615, [section] 2617 provides no relief unless the employee has been prejudiced by the violation." In cases where prejudice is shown, the employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B). *Saroli*, 405 F.3d at 455 (quoting *Cavin*, 346 F.3d at 726). In other words, "the FMLA is not a strict-liability statute." *Edgar v. JAC Prods., Inc*., 443 F.3d 501, 507 (6th Cir. 2006). "A plaintiff seeking relief under the interference or entitlement theory must show that the violation caused him harm." *Ray v. AT&T Mobility LLC*, 2020 WL 535787, at *11 (E.D. Ky. Feb. 3, 2020) (quoting *Harris v. Metro. Gov't of Nashville and Davidson Cty*., 594 F.3d 476, 484 (6th Cir. 2010)). It is not enough that a defendant "technically violated [an] FMLA regulation," *Verkade v. United States Postal Serv*., 378 Fed. Appx. 567, 575 (6th Cir. 2010), where it has been shown that the employee has received all of the "substantive benefits" to which they are entitled under the FMLA. *See Banks v. Bosch Rexroth Corp*., 610 Fed. Appx. 519, 524-526 (6th Cir. 2015). Cipolletti has neither identified nor offered evidence of any damages stemming

from any discouragement. He has also not sought any equitable relief. (ECF No. 1, PageID.5, 6-7). Accordingly, his interference by discouragement claim fails.

2. FMLA Retaliation Claim

A plaintiff establishes a *prima facie* case of FMLA retaliation by showing the following:

> (1) [that] [ ]he was engaged in an [FMLA protected] activity; (2) the employer knew that [ ]he was exercising h[is] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to h[im]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citing *Killian*, 454 F.3d at 556). In the absence of direct evidence and where the prima facie case is established, an FMLA retaliation claim is then evaluated under the *McDonnell Douglas* burden shifting paradigm. *Seeger*, 681 F.3d at 284. Like the interference claim, even if a prima facie case has been established, if the defendant has articulated a legitimate, nondiscriminatory reason for terminating the plaintiff's employment, the burden of establishing pretext shifts to plaintiff. *Id*. This requires plaintiff to demonstrate the reason for his termination "(1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action." *Seeger*, 681 F.3d at 285.

While it was not entirely clear from the briefing that Cipolletti is proceeding on a retaliation claim, at the hearing he clarified that he is. He claims that WCAA's failure to award him the promotion was in retaliation for taking FMLA leave. In his brief, however, he does not address the elements of an FMLA retaliation claim and does not directly address the issue of pretext. WCAA does not appear to dispute that failure to promote qualifies as an adverse employment action, but it maintains that Cipolletti makes no causal connection between his use of FMLA leave and the decision to award the promotion to another candidate. *Rossi v. Wayne Co. Airport Authority*, 2021 WL 1026909, *4 (E.D. Mich. Mar. 17, 2021) ("[F]ailure to promote an employee is a quintessential adverse employment action.") (citing *Groening v. Glen Lake Cmty. Schs.*, 884 F.3d 626, 632 (6th Cir. 2018)).

Cipolletti applied and interviewed for the Training Coordinator position. (ECF No. 22-2, Ex. A 20:13-1 5, 23:2-8). The interview process for the position included an initial application followed by a panel interview if the candidate meets the minimum qualifications. (ECF No. 22-2, Ex. A 23:17-25, 24:1-4). Noble, Barclay Stewart, and Thomas Zahina comprised the interview panel for the Training Coordinator position. (ECF No. 22-2, Ex A. 26:5-10). The interview involved scoring the candidates' responses to a series of predetermined interview questions. (ECF No. 22-3, Ex. B 30:10-23). The answers were scored

individually.  (ECF No. 22-3, Ex. B 30:10-23).  Each question had suggested answers and multiple possible points that the interviewers were expecting the candidate to mention.  (ECF No. 22-3, Ex. B 30:10-23; ECF No. 22-17, Ex. P). The number of points mentioned by a candidate would affect the score.  (ECF No. 22-3, Ex. B 30:10-23).  Human Resources was responsible for computing the scores.  (ECF No. 22-3, Ex. B 19:6-9).  Cipolletti received a score of 83, while another candidate, John Barile received a 94.  (ECF No. 22-18, Ex. Q).  As a result, Barile was ranked first and Cipolletti was ranked second.  (ECF No. 22-18, Ex Q; ECF No. 22-19, Ex R).  Under the operative union contract, WCAA has the choice to pick any candidate ranked between one and five.  (ECF No. 22-3, Ex. B 19:10-11, 14-16).  Noble, Stewart and Smouthers chose Barile, as the first-place candidate to be promoted to the Training Coordinator position in February 2019. (ECF No. 22-19, Ex R).  WCAA maintains that Cipolletti was not chosen for the promotion simply because Barile performed better in the interview.  Cipolletti argues that the scores were "subjective" and Noble had warned him that using FMLA leave could hurt his chances of promotion.  (ECF No. 23-2, Cipolletti dep. pp. 45, 100).  Cipolletti also points to an email Noble wrote to Smouthers and Stewart on April 8, 2019, which he characterizes as Noble showing "disdain" for Cipolletti's use of FMLA leave.  (ECF No. 23-9) ("Clayton called off FMLA on Saturday for Friday 6th and Monday 8th.  I believe Clayton is a significant

liability. I worried [sic] Clayton could be involved in an event that could bring a bad name to WCAA and Public Safety Division.").

The analysis of the retaliation claim set forth in *Rossi v. WCAA* is instructive. In *Rossi*, the court assumed without deciding that the plaintiff could satisfy her burden of showing causation for purposes of the prima facie case because such a burden is "not onerous" and "poses a burden easily met." *Id.* at *4 (quoting *Provenzano v. LCI Holdings*, *Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000)). Instead, the court turned to WCAA's burden at step two of the *McDonnel Douglas* standard: it must show a legitimate, non-discriminatory reason for failing to promote the plaintiff. The court found that WCAA met this burden:

> The HR department tallied the results of the candidates' exams based on a rubric assigning 40 percent weight to "technical qualifications" and 60 percent to "personal qualifications." After the interview scoring was complete, Rossi (64 out of 75 points) failed to gain the best score among the six candidates. John Barile met the qualifications to apply and then was promoted based on the standard criteria from HR. This constitutes a legitimate, nondiscriminatory reason.

*Id*. at *4. Accordingly, the plaintiff was required to show that WCAA's proffered reason "was not the true reason for the employment decision, but rather a pretext for discrimination." *Id*. at *5 (quoting *Provenzano*, 663 F.3d at 815). As the Sixth Circuit has explained: "A plaintiff can refute the legitimate, nondiscriminatory

reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Provenzano*, 663 F.3d at 815 (quoting *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 576 (6th Cir. 2003) (*en banc*)). In *Rossi*, the plaintiff tried to show pretext by arguing that a less qualified person was promoted. The court noted that there are two ways to establish a triable issue of fact on this issue: "(1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Rossi,* at *5 (quoting *Provenzano*, at 815). But, the court found that no reasonable factfinder could conclude that WCAA's reason was pretext for FMLA retaliation because the record did not show how the chosen candidate scored on his interview and his resume and qualifications were not in the record. More specifically, the court concluded:

> To be sure, Rossi lists many certifications on her resume and was employed at one level above Barile prior to the promotion. And Noble's purported warning not "to be out sick on FMLA all the time," which must be taken as true on summary judgment, is troubling, as was another supervisor's statement that medical leave would "look bad." But in order to survive summary judgment, Rossi at least must show evidence that she was a plainly

> superior candidate to Barile or that she was equally qualified (with other evidence of discrimination). Yet, the record does not include Barile's resume, qualifications, or test scores. Ultimately, no reasonable juror could conclude that Rossi was plainly superior to Barile or even equally qualified to him.

*Id*. at *5.

Here, WCAA has come forward with a legitimate non-discriminatory reason for hiring Barile over Cipolletti. After the interview, Cipolletti was ranked second on the list of candidates. (ECF No. 22-19, Ex Q; ECF No. 22-19, Ex. R). The evidence shows that Noble, Stewart and Smouthers chose the first-place candidate, John Barile, to be promoted to the Training Coordinator position because he was first on the list. (ECF No. 22-19, Ex R). According to WCAA, the decision to promote Barile instead of Cipolletti was based solely on the scores of their interviews.

As mentioned above, Cipolletti has not addressed the issue of pretext in his briefing. Accordingly, the court could simply conclude that he failed to come forward with evidence to show that WCAA's proffered reason "was not the true reason for the employment decision, but rather a pretext for discrimination." *See Rossi*, *supra*. It is not for the court to develop and support a plaintiff's argument for him. *See McPherson*, *supra*, ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal

way, leaving the court to ... put flesh on its bones.") (citation omitted). However, Cipolletti's brief does suggest some evidence of pretext in that he argues that he trained the successful candidate, had more seniority, and was told he was a "shoo-in" for the position. Yet, accepting these allegations as true, Cipolletti has not shown that he "(1) … was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as, if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Rossi*, at *5 (quoting *Provenzano*, at 815). In *Rossi*, the court concluded that such a showing could not be made absent evidence of Barile's test scores, resume, and qualifications.

Here, the test scores are in the record and show that Barile's scores were higher than Cipolletti's, which undermines any argument of pretext. Cipolletti also offers his positive performance evaluation for 2018, but does not offer any performance evaluation for Barile, for purposes of comparison. (ECF No. 23-3; ECF No. 23-2, p. 101) (Cipolletti has never seen Barile's employment file, except his training records that he put together and he does not know if Barile ever took FMLA leave.). And, while Cipolletti has argued that the test scores were "subjective," he has come forward with no evidence to support this claim or any claim that Noble influenced the two other interviewers, or even that Noble's own scoring reveals an animus toward Cipolletti. In fact, Cipolletti testified at his

deposition that he does not know how the interview questions were scored by any of the interviewers and he has no evidence that Noble influenced the promotion decision. (ECF No. 23-2, p. 88). He further testified that he did not know how the scoring process worked. (ECF No. 23-2, p. 96). With respect to being told he was a "shoo-in" and having trained Barile, Cipolletti neither explains how these facts render him more qualified than Barile nor does he provide any case law suggesting such facts have bearing on the qualification analysis. As in *Rossi*, without more robust evidence on which to base a comparison of the two candidate's qualifications, Cipolletti has not shown that he was either the superior candidate or at least as qualified as Barile with accompanying evidence of discrimination.[2] Accordingly, to the extent Cipolletti has attempted to claim pretext, he has failed to create a genuine issue of material fact.

## IV. CONCLUSION AND ORDER

For the reasons set forth above, the court concludes that plaintiff has failed to come forward with evidence showing a material question of fact on either of his

[2] The court does not suggest that Cipolletti has failed to come forward with any evidence of discrimination, given his own testimony about conversations with Noble discouraging him from using FMLA leave and suggesting it would affect his chances of promotion. Less probative is the April 2019 email from Noble, given that it was sent months after the promotion decision was made. Despite this evidence, the record remains devoid of a comparison of Cipolletti's and Barile's qualifications sufficient to suggest that they are equally qualified. Indeed, the only evidence in the record on this issue – the test scores – shows that Barile was the superior candidate.

FMLA claims.  Accordingly, defendant's motion for summary judgment is

**GRANTED**.

   **IT IS SO ORDERED**.

Date: July 22, 2021                    s/Stephanie Dawkins Davis
                                       Stephanie Dawkins Davis
                                       United States District Judge